In the Matter of the Petition of IRVING TRUST COMPANY (Successor to AMERICAN EXCHANGE IRVING TRUST COMPANY) to Render and Settle Its Account as Executor of the Estate of HAROLD P. LILIENTHAL, Deceased.

Surrogate's Court, Kings County, March 14, 1930.

*Walter Avery*, for the petitioner.

*Hawkins, Delafield & Longfellow*, for the respondent.

*John F. Crotty*, special guardian for Daniel E. Allen, Jr., and Dorothy Allen, infants.

WINGATE, S. This case arises upon objections interposed by an alleged creditor to the final account of the executor of Harold P. Lilienthal, whose will was admitted to probate in this court on January 16, 1928. The claim of the creditor is for $9,218.33 with interest from October 17, 1927, and is presented on behalf of Edith McK. Donham as a result of the following transactions.

During the month of March, 1927, the decedent and one Harry R. Kneezel caused a corporation to be organized under the laws of the State of New York with the corporate title of H. P. Lilienthal & Co., Inc., for the purpose, among others, of dealing in securities. One hundred shares of its capital, which amounted to 1,000 shares of $10 par value each, were issued, 49 to Lilienthal, 49 to Kneezel, one to Kneezel's wife and one to Nettie Louise Palmer, who appears to have acted as a dummy for Lilienthal. These four constituted the board of directors. Lilienthal was elected president, and Kneezel secretary and treasurer. No meetings of the corporation were held subsequent to the formal organization meetings on March 15, 1927, until after Lilienthal's death, which occurred on July 23, 1927.

On April 5 and 7, 1927, two agreements were entered into between the Lilienthal Company, Lilienthal, the claimant, Mrs. Donham, and her husband, and the claim in controversy is based upon the transactions therein reflected. It is recited in these agreements that the company shall forthwith deposit with Tucker, Anthony & Co. (which was the Stock Exchange firm through which it transacted its business) securities having a market value of not less than $2,000 and that the claimant should deposit like securities to a value of not less than $8,700, all of which should be held by Tucker, Anthony & Co. as collateral for the Lilienthal Company account with power to realize thereon in event of loss, etc. This agreement was to continue for one year unless canceled by the claimant,

which power was given her at any time if the Lilienthal Company securities depreciated below a value of $1,000. The claimant appointed her husband, B. C. Donham, as her agent in all matters affecting the arrangement and was to receive $50 monthly from the company for the use of her securities.

The supplementary agreement, as far as here material, read: " * * * in consideration of said deposit by the party of the second part [Mrs. Donham] * * * H. P. Lilienthal & Co., Inc., Harold P. Lilienthal and Harry R. Kneezel, jointly and severally, agree to repay to her any loss she may sustain owing to the sale of said securities by Tucker, Anthony & Co., or the non-return of said securities to her or otherwise in connection with said agreement, and that in case of any loss, her claim shall be maintained at law against any one or all of said parties of the first part for the entire amount of such loss."

It was stipulated that these two agreements should be construed as one.

The state of the Tucker, Anthony & Co. account on July 23, 1927, the date of Lilienthal's death, was not made to appear, nor indeed is it material. It does, however, appear that on September 19, 1927, which date is most material, as will be seen later, the account showed an equity of $8,756.74, which was $56.74 in excess of the value of the securities which Mrs. Donham was obligated to deposit under the terms of her agreement. Obviously, from this demonstration, the $2,000 equity of the Lilienthal Company in the account had been reduced below $1,000, so that on that date Mrs. Donham had the absolute right to cancel the arrangement without notice and repossess her securities with little, if any, loss.

In the opinion of the court, one of the most important points to be noted relating to the transactions subsequent to Lilienthal's death is the fact that the claimant's husband was at all times her agent. This appears not only from the agreement itself, but even more clearly from the record during the course of the claimant's examination. The following appears at pages 25 and 26: " The Surrogate: Suppose we stipulate on the record that Mr. Donham was Mrs. Donham's agent and that his acts were done pursuant to her authority * * * Mr. Delafield: I will stipulate that. * * * Q. Did your husband, Mrs. Donham, act as your agent in all the transactions that you had with this corporation? A. He did. Q. By the Surrogate: Whatever he did he did by your authority and you stand by him now? A. Yes, I will."

Although hardly necessary to be decided in view of these admissions, the irresistible inference from the record as a whole is that Mrs. Donham was really little, if any, more than a dummy

in the entire matter and that her husband was in fact the real party in interest.

It appears that Donham learned of Lilienthal's death early in September from Kneezel, at which time the latter suggested that Donham take the decedent's place in the business. This was followed on September nineteenth by the first meeting of the corporation held since the formal organization meetings. At this meeting Donham was elected a director and treasurer of the company, " his duties to begin immediately," and Mrs. Donham was also elected a director in place of Miss Palmer, Lilienthal's dummy. In other words, Mr. and Mrs. Donham entirely replaced the decedent and his representative in the conduct of the affairs of the company. This action was taken after an inspection by Donham of the last Tucker, Anthony statement which showed " a considerable profit at that time from the operation."

Mr. Donham further testified: " Q. When you investigated and found the condition of the corporation to be satisfactory then you decided to go into the business; is that correct? A. I decided to become the treasurer and a director."

On October 4, 1927, a further meeting of the board of directors was held with Kneezel and Donham present. The other two directors, who were their respective wives, did not attend. That meeting shows a report " that it was urgently necessary to increase the securities in the trading account." Information regarding a sizable loss on a company transaction was also spread upon the minutes. With all this disclosed, an offer by Mrs. Donham was reported and accepted, to purchase 100 shares of the capital stock — an amount equal to that held by Kneezel and Lilienthal's estate together — and to lend the company $8,000 additional bonds to secure its trading account, with permission to Mrs. Donham to withdraw all bonds, including those covered by the original agreement, at any time she or her agent-husband should elect. It is also of interest that these minutes, which were initialed by Mr. Donham, contained the following entry: " The President then stated that, owing to the serious losses sustained by the Corporation during the month of September, he would accept a minimum living salary of $70 per week until such time that the finances of the Corporation were in condition that the Treasurer could recommend to the Board an increase in said salary."

It was also agreed at this meeting that Mrs. Donham should receive a payment of $70 a week for the use of the $8,000 additional bonds to be deposited by her to bolster the company account with Tucker, Anthony & Co.

Donham testified (Stenographer's Minutes, p. 36) that he was

familiar with the transactions of the business after he became treasurer and until his resignation, which occurred on October twentieth after the final losses and closing out of the trading account by Tucker, Anthony & Co. on October twelfth.

The conclusion from the entire record is irresistible that Kneezel persuaded Donham that the business was a profitable one, which was apparently the fact until about the time Donham became associated with it. Donham and his wife were to, and actually did, take the place of the decedent and his dummy in the business. The returns to the parties from the business were made equal, seventy dollars a week to each, with no increase possible without mutual agreement. Denominating Mrs. Donham's seventy dollars a week payment for the use of her bonds is evident subterfuge, since about six months before her return for the use of a greater sum was fifty dollars a month. On the same basis, her return for the use of all bonds after October fourth would have been about a third of the sum agreed to be paid. The payments were evidently in essence the equal drawing accounts usually allowed equal partners in a business.

The agreement upon which the claimant here seeks recovery is one for personal liability of Lilienthal in the event of the default of another, such other being the incorporated partnership of Lilienthal and Kneezel. The rules of law applicable to such relations are well established in this State, and depend upon the intentions of the parties construed in the light of the circumstances at the time the engagement had its inception.

As is said by the Court of Appeals in *Richardson* v. *County of Steuben* (226 N. Y. 13, at p. 19): " The rule that the liability of a surety is to be strictly construed is so often reiterated with a very general sense of its true meaning that we perhaps may profitably recall just what its application is to such a case as this. It does not mean that in interpreting the undertaking of a surety we are to be governed by different fundamental rules than those which are applicable to the construction of another contract. And least of all does it permit us to cast aside the principle applicable to all contracts that in their interpretation we are to seek for the true intent of the parties who executed them. After that intent has been discovered and the meaning of the contract determined, it is of course true that the liability of a surety is to be strictly and rigidly limited by the scope and meaning of the instrument which he has executed (*People* v. *Backus*, 117 N. Y. 196; *Bennett* v. *Draper*, 139 N. Y. 266). In ascertaining that intention and construing the language which has been used in a contract of suretyship, as well as in another contract, that language is to be read in the light of the surrounding circumstances (*People* v. *Backus, supra*)."

Reading these agreements in the light of such surrounding circumstances, it must be apparent that the intention of the parties was that Lilienthal was to guarantee the Donhams against loss through dealings by the firm of which he was a member, and that there was no thought by either party that such guaranty should extend to the speculations of a business in which the Donhams themselves possessed a fifty per cent interest and over whose actions and engagements neither Lilienthal nor his representative had any control.

Not only did the Donhams assume a fifty per cent voice in the affairs of the company by reason of their acquisition of one-half of all of the issued stock, but they accepted and exercised a fifty per cent voice in the directorate, *i. e.*, the management of the business, to the complete exclusion of the estate of him whom they seek to charge. Finally, there was a material alteration in the terms of the obligation guaranteed, in that Mrs. Donham's return from the company was increased over six times and she was authorized to withdraw any part of her securities at any time, whereas in the agreement guaranteed her rights in this regard were specifically circumscribed and limited. Under such circumstances, the rule of law enunciated in *Page* v. *Krekey* (137 N. Y. 307) applies. The court says (at p. 314): " * * * the defendant's obligation is *strictissimi juris*, and he is discharged by any alteration of the contract, to which his guaranty applied, whether material or not, and the courts will not inquire whether it is or is not to his injury."

To like effect see *St. John's College* v. *Ætna Indemnity Co.* (201 N. Y. 335, 341); *Smith* v. *Molleson* (148 id. 241, 246, 247); *Antisdel* v. *Williamson* (165 id. 372, 375); *City of New York* v. *Clark* (84 App. Div. 383, 385); *American Casualty Insurance Co.* v. *Green* (70 id. 267, 270).

That the result attained is just must be unquestionable, since it would be obviously inequitable to permit the Donhams to speculate in the stock market on a basis permitting them to take half the profits if successful, and charge the decedent's estate, which had no voice in the matter, with all of the losses, if luck turned against them.

The entire dissimilarity of the facts in the case at bar renders the authority of *Assets Realization Co.* v. *Roth* (226 N. Y. 370) inapplicable, particularly when that case is read in conjunction with the complementary determination in *Assets Realization Co.* v. *Howard* (211 N. Y. 430).

The claim is, therefore, disallowed.

Settle decree on notice accordingly.